IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SCOTT SPATZ, as Special Administrator of the
Estate of HERBERT SPATZ,

       Plaintiff,

Case No. 16-cv-726

vs.

WEYERHAEUSER COMPANY, *et al.*,

       Defendants.

---

## DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S RULE 26(a)(1) INITIAL DISCLOSURES

Defendant Metropolitan Life Insurance Company ("Metropolitan Life"), by and through counsel, provides the following F.R.C.P. 26 (a)(1) Initial Disclosures.  Metropolitan Life's responses are made in a good faith effort to supply as much information as is currently available to Metropolitan Life.  This should in no way prejudice Metropolitan Life in relation to any further discovery or analysis of Plaintiffs' claims in this case.  Metropolitan Life anticipates that further discovery will be necessary and, as such, reserves the right to supplement these responses as necessary.

    **1.**    **Rule 26(a)(1)(A)(i).**

Metropolitan Life refers Plaintiffs to the Witness List attached hereto which sets forth the name and address of each witness whom Metropolitan Life may call at trial, the subject matter on which each witness is expected testify, the experts educational background and qualifications, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Metropolitan Life reserves the right to call any witness, or expert witness named by any other party, and to call any witness as necessary for the purpose of rebuttal or impeachment, and to

name such other witnesses as may become known as discovery is continuing.  In accordance with the Federal Rules of Civil Procedure, Metropolitan Life also reserves the right to supplement these disclosures as additional individuals become known through discovery.

    **2.**      **Rule 26(a)(1)(A)(ii).**

    Metropolitan Life states that it is in a unique situation in this action.  Metropolitan Life is not an asbestos manufacturer.  The allegations that may pertain to Metropolitan Life generally pertain to a period of time from at least 60 to more than 80 years ago.  Many of the Metropolitan Life documents that might relate to such alleged events are no longer available.  Many of the documents currently in Metropolitan Life's files are not originals, are unsigned, and present an incomplete or fragmentary record of such alleged events.

    In connection with discovery requests in certain lawsuits, Metropolitan Life has conducted extensive searches over many months' duration for documents that were maintained in the files of Metropolitan Life in the usual course of business, that were prepared prior to 1975 (long after any purported conduct of Metropolitan Life alleged in the Complaint), and that deal in a reasonably direct manner with the health effects of asbestos or asbestos-containing products.  These searches also included, inter alia, reasonable efforts to locate documents (if any) constituting, containing, referring to, discussing, or otherwise pertaining to any and all communications between or among Metropolitan Life and other persons and entities regarding the health effects of asbestos or asbestos-containing products.  These searches were particularly difficult and complex because they covered a period that began more than 70 years ago, because any documents that may continue to exist after such a long period likely were not maintained in their original locations, and because any persons who may have been involved in the preparation and maintenance of documents prepared during that period -- and who might have been able to assist in the recovery of any documents that might still exist after so many years -- are deceased or no longer employed by Metropolitan Life.  Neverthe-less, through these search efforts, Metropolitan Life has located thousands of document pages that it

could identify as being within the scope of the searches.  Accordingly, Metropolitan Life refers Plaintiffs to a collection of documents that are from the files of Metropolitan Life maintained in the usual course of business, that were prepared prior to 1975, that Metropolitan Life has located through the date of this disclosure in the course of the searches described above, as well as certain other documents produced by Metropolitan Life in certain prior lawsuits containing allegations similar to those in this lawsuit ("available records").

   **3.     Rule 26(a)(1)(A)(iii).**

This request is more appropriately directed to Plaintiffs.

   **4.     Rule 26(a)(1)(A)(iv).**

With respect to insurance agreements, Metropolitan Life states that the policy underlying the disclosure of insurance information is implicated where such information would bear on the issue of a defendant's ability to satisfy a judgment.  That policy concern is unlikely to be implicated here. Nevertheless, Metropolitan Life states that it had or has had a liability insurance program with a number of carriers.  To the extent Plaintiffs are seeking additional or different information Metropolitan Life is prepared to meet and confer with Plaintiffs' counsel regarding this issue.

                          von BRIESEN & ROPER, S.C.

DATED: September 26, 2017.          By:     s/ Smitha Chintamaneni
                                      Smitha Chintamaneni
                                      WI Bar No. 1047047
                                      Attorney for Defendant,
                                      Metropolitan Life Insurance Company

**P. O. ADDRESS**:
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
PH:    (414) 287-1515
Fax:    (414) 276-6281
Email:  schintam@vonbriesen.com

29346365_1.DOCX

## DEFENDANT METROPOLITAN LIFE
## INSURANCE COMPANY'S WITNESS LIST

Defendant Metropolitan Life Insurance Company ("Metropolitan Life") designates the following witnesses who may testify at the trial of the above-captioned case:

1.    Alfred Angrist, Deceased (by deposition)

      Deposition:

      (a)    In re: Asbestos Cases, (Charleston, South Carolina) (December 3, 1979)

      State-of-the-Art

2.    Margaret J. Baumgardner
      3390 Peoria Street, Suite 304
      Aurora, CO  80010

      Ms. Baumgardner is expected to testify regarding the authenticity of certain documents in the Claims Resolution Management Corp./Manville Personal Injury Settlement Trust.

3.    Paul E. Caplan
      1484 Sigma Circle
      Cincinnati, OH 45255

      Worked with Dr. Lanza

4.    W. Clark Cooper, M.D., M.P.H., Deceased (by prior testimony)

      TLV's, State-of-the-Art and Activities for the U.S. Public Health Service

5.    Carlos Creamer
      Metropolitan Life Insurance Company
      c/o Steptoe & Johnson LLP
      1114 Avenue of the Americas
      New York, NY 10036

      Corporate representative

6.    Andrea Crichton
      Manchester, England

      Document authentication

7.    Lois Dennis (by deposition)
      2017 Hudson Terrace
      Fort Lee, NJ 07024

Depositions:

(a)   <u>Marshall Smith, et al. and consolidated cases v. Johns-Manville Corp., et al. and Third-Party Actions</u>, Civil Action Nos. 77-2047, 79-9, 79-1992, 79-2680, 79-2218, 79-3056, 80-179, 80-264 (U.S. District Court, District of New Jersey) (March 22, 1983)

(b)   <u>Marshall Smith, et al. v. Johns-Manville Corp. and Third-Party Actions</u>, Civil Action Nos. 77-2047, 79-9, 79-1992, 79-2680, 79-2218, 79-3056, 80-179, 80-264 (U.S. District Court, District of New Jersey) (June 13, 1984)

(c)   <u>Alma Fortenberry, et al. v. Raymark Indus., Inc., et al.</u>, No. B-84-1167-CA (U.S. District Court, Eastern District of Texas, Beaumont Division) (July 25, 1988)

(d)   <u>E. Marie Greene, et al. v. Amtorg Trading Corp., et al.</u>, Docket No. L-068486-81 (Superior Court of New Jersey Law Division, Middlesex County) (August 23, 1988)

Document authentication


8.   Hugh Jackson (by deposition)
     5205 Skytrail Street
     Littleton, CO 80123

     Document authentication

9.   R. Emmet Kelly, M.D., Deceased (by deposition)

     Video Deposition:

     (a)   <u>Wesley G. Abels, et al. v. A.P. Green Industries, Inc., et al.</u>, Case No. 91-34501 (Circuit Court of the 11th Judicial Circuit in and for Dade County, Florida) (October 10, 1991)

     Practiced Industrial Medicine in the 1930's-1970's and is knowledgeable about Dr. Lanza.

10.  Daniel May
     Metropolitan Life Insurance Company
     c/o Steptoe & Johnson LLP
     1114 Avenue of the Americas
     New York, NY 10036

     Mr. May is expected to testify regarding the authenticity of certain documents in Metropolitan Life Insurance Company's files.

11.  Kenneth Nelson (by deposition)
     1894 Millcreek Way
     Salt Lake City, Utah 84106

Depositions:

(a)   <u>Killian et al., v. Eagle Picher Industries, Inc. et al.</u>, Case No. 84325057, 84276045 (Circuit Court for Baltimore City, Maryland) (December 16, 1988)

(b)   <u>In Re: Baltimore City Personal Injury and Wrongful Death Asbestos Cases</u>, and <u>Abate, et al., v. ACandS, Inc., et al.</u>, Case No. 89236704 (Circuit Court for Baltimore City, Maryland) (March 22, 1991)

Knowledgeable about Industrial Hygiene practice in the 1940's, including the activities of the Federal Government

12.   David Ozonoff, M.D.
Boston University School of Public Health
Department of Environmental Health
Talbot 3C
80 East Concord Street
Boston, MA 02118

State-of-the-Art

13.   Philip C. Pratt, M.D., Deceased (by prior testimony)

Prior Testimony:

<u>Philip Scordino v. Owens-Corning Fiberglas Corp., et al.</u>, C.A. No. 89-5139(3) and <u>Dwight Copeland v. Metropolitan Life Insurance Co., et al.</u>, C.A. No. 89-5142(3) (Circuit Court of Jackson County, Mississippi) (February 22, 1991)

<u>In Re: Asbestos Litigation</u>, C.A. No. 77C-ASB-2 (Superior Court of the State of Delaware, New Castle County) (December 13, 1991)

<u>Margaret Bard et al. v. Pittsburgh Corning Corp., et al.</u>, Case No. 82-2-12445-1 (Superior Court of the State of Washington, County of King) (October 30, 1995)

14.   Ralph G. Smith, Deceased (by prior testimony)

Prior testimony:
(a)   Cinnaminson Township Board of Education, Civil Action No. 80-1842 (United States District Court for the District of New Jersey) (October 26, 1988)

Development of TLV's

15.   Kemener Whalen, Deceased (by deposition)

Deposition:

(a)   <u>Bialy v. Johns-Manville, et al.</u>, Civil Action No. 79-1336 (United States District Court for the District of New Jersey)  (April 1, 2, and 11, 1986)

Knowledgeable about workplace practices in the 1930's and 1940's

16.   George M. Wheatley, M.D., Deceased (by prior testimony)

Former Metropolitan Life employee

17.   Frank Wood
President of Picher Mining Museum
526 N. Connell Avenue
Picher, OK 74360

Mr. Wood is expected to testify regarding the authenticity of certain documents located in the Picher Mining Museum.

18.   George W. Wright, Deceased (by deposition)

Deposition:

(a)   <u>Claude Cimino, et al. v. Raymark Industries, Inc., et al.</u>, Civil Action No. B-86-0456 (United States District Court for the Eastern District Court of Texas Beaumont Division) (January 30, 1990)

Practiced Industrial Medicine in the 1940's-1970's

19.   Records Custodian of the Trudeau Foundation

Algonquin Avenue
Saranac Lake, New York

Document authentication

20.   Records Custodian
National Museum of Health and Medicine
Armed Forces Institute of Pathology
Walter Reed Army Medical Center
Washington, DC 20306-6000

21.   All witnesses named by any other party in this action, even if the Plaintiff or defendant naming that witness is no longer a party to this lawsuit at the time of trial.

22.   All witnesses deposed or to be deposed by any party in this action, even if the Plaintiff or defendant deposing that witness is no longer a party to this lawsuit at the time of trial.

23.   All doctors and other health care professionals who have treated or examined Plaintiffs.

24.   Records Custodians as may be necessary to authenticate documents to be used by Metropolitan Life at trial.

25.   Elliot Kagan, M.D.
Department of Pathology

Georgetown University School of Medicine
3900 Reservoir Road, N.W.
Washington, DC 20007

26.    Members of the ACGIH TLV Committee from 1946 to the present.

27.    Certain employees or former employees of the Dayton-Walther Corporation or any successor corporation to the Dayton-Walther Corporation

Metropolitan Life does not, by listing any person as a potential witness, vouch for that person's competence as a witness.  Metropolitan Life reserves the right to challenge the expertise and competence of any witness called to testify live or by deposition, including those listed above.

**Expert Witnesses**

1.    Peter J. Barrett, M.D., (by deposition)

Dr. Barrett is a physician who is an expert in the field of radiology.  He is a NIOSH certified "B" Reader.  Furthermore, Dr. Barrett is an expert in the etiology and diagnosis of pneumoconiosis, including asbestosis, as well as asbestos-related disease, based upon review of medical records, x-rays, CT scans, and other materials.

Dr. Barrett is expected to testify concerning general medical issues, including the methods and criteria for the diagnosis of asbestos-related diseases, and specifically regarding his opinions of causation of disease in humans.  Dr. Barrett is expected to testify generally about the human body's defense mechanisms, including the human respiratory system and related medical issues.  Dr. Barrett is further expected to testify concerning the diagnostic tools used in diagnosing asbestos-related disease.

Dr. Barrett is expected to testify on matters pertaining to the diagnosis of the condition of plaintiffs in these cases specifically.  He is also expected to testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiffs, including but not limited to, x-rays, CT scans, and other materials that he will review.

2.    Philip T. Cagle, M.D., Center for Pulmonary Pathology, Baylor College of Medicine, Department of Pathology, Room 286A, One Baylor Plaza, Houston, TX 77030.

Dr. Cagle is a physician who is an expert in the field of pathology.  Furthermore, Dr. Cagle is an expert in the etiology and diagnosis of asbestos-related disease based upon review of tissue and tissue slides obtained as a result of biopsy or autopsy.

Dr. Cagle is expected to testify concerning general medical issues, including the methods and criteria for the diagnosis of asbestos-related diseases, and specifically regarding his opinions of causation of disease in humans.  Dr. Cagle is expected to testify generally about the human body's defense mechanisms, including the human respiratory system and related medical issues.

Dr. Cagle is expected to testify on matters pertaining to the diagnosis of the condition of plaintiffs in these cases specifically.  He is also expected to testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiffs, including, but not limited to, tissue and/or slides that he will review.

3.    Michele Carbone, M.D., Ph.D., University of Hawaii, Cancer Research Center of Hawaii, 701 Ilalo St., BSB Room 622, Honolulu, Hawaii  96813.

Dr. Carbone's testimony will focus mainly on two issues: (a) Dr. Gardner's experiments and their relevance and (b) criteria to establish human cancer etiology.  In addition, Dr. Carbone may testify concerning general medical issues, including the methods and criteria for the diagnosis of mesothelioma, and the causation of mesothelioma in humans to the extent relevant to this case.  He also may testify regarding whether a plaintiff has or does not have mesothelioma based on his review of available medical records.

Dr. Carbone is qualified to testify as an expert on the basis of his education, training and experience in the field of pathology, and by his scientific research and publication in the field of asbestos, mesothelioma, animal and human carcinogenesis and cancer etiology.  Dr. Carbone is a Board-certified pathologist, a Professor of Pathology and the Director of the Thoracic Oncology Program at the Cancer Research Center of Hawaii.  Previously, Dr. Carbone held scientific and academic positions at the National Institutes of Health ("NIH") at the University of Chicago and at Loyola University.  During his fellowship at the NIH, Dr. Carbone obtained his Ph.D. in Human Pathology through a combined research program between the Medical School of Rome "La Sapienza" and the NIH, and is licensed to practice medicine in the states of Hawaii and Illinois.  Dr. Carbone's work in the causation and diagnosis of mesothelioma, including asbestos pathogenesis, has been and is funded by research grants from the National Cancer Institute ("NCI") and the American Cancer Society.  Dr. Carbone has authored and co-authored more than 150 scientific publications and book contributions.

With respect to (a) and (b) above, Dr. Carbone is expected to testify about the accepted scientific standards and methods for conducting cancer research, including protocols and use of animals in cancer experimentation, and customs and practices regarding editing, peer review, publication of manuscripts and scientific articles, the application process to the NCI for grant funding, and in general on how cancer research is funded.  Dr. Carbone will testify about the NCI and the NIH peer review mechanism to fund cancer research and the significance of such funding.  He will also testify on the mechanisms and options available to researchers to bring to the attention of the public health authorities discoveries that may have an impact on human health.  With respect to the Saranac Laboratory, Dr. Carbone is expected to testify concerning Dr. Gardner's asbestos dust inhalation studies, the possible scientific and public health significance of those studies, and whether the results of the studies were or were not brought to the attention of the public health authorities.

The facts known to this expert that relate to, or form the basis of, his opinions include those facts contained in documents relating to the inhalation dust studies performed at the Saranac Laboratory, including correspondence, memoranda, transcripts, drafts and published reports and related material, as well as, facts obtained about cancer research during the course of his education and professional activities.  Such facts may also include additional facts ultimately

obtained from review of the medical literature and review of testimony of fact and expert witnesses in this litigation.

4.  Andrew Churg, M.D., Department of Pathology, University of British Columbia, 2212 Westbrook Mall, Vancouver B.C. Canada.

Dr. Churg is a physician who is an expert in the field of pathology.  Furthermore, Dr. Churg is an expert in the etiology and diagnosis of asbestos-related disease based upon review of tissue and tissue slides obtained as a result of biopsy or autopsy.

Dr. Churg is expected to testify concerning general medical issues, including the methods and criteria for the diagnosis of asbestos-related diseases, and specifically regarding his opinions of causation of disease in humans.  Dr. Churg is expected to testify generally about the human body's defense mechanisms, including the human respiratory system and related medical issues.

Dr. Churg is expected to testify on matters pertaining to the diagnosis of the condition of plaintiffs in these cases specifically.  He is also expected to testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiffs, including but not limited to, tissue and/or slides that he will review.

5.  Richard Cohen, M.D., MPH, P.O. Box 3717, Saratoga, CA 95070.

Dr. Cohen is expected to testify on matters relating to occupational medicine.

Dr. Cohen is qualified to testify as an expert on the basis of his education, training, and experience in the field of occupational medicine and public health.  He received his Medical Degree from the University of Michigan and a Masters of Public Health in Epidemiology from the University of California, Los Angeles School of Public Health.  Dr. Cohen is Board certified in the fields of general preventive medicine and occupational medicine by the American Board of Preventive Medicine.  Dr. Cohen practices in the area of occupational medicine and industrial toxicology as a consultant for government entities, private enterprises, and individuals.

Dr. Cohen is expected to testify about the state of the art as it relates to asbestos and health in the published medical and scientific literature presently and throughout the last century.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include published articles in the medical and scientific literature, government reports, documents produced and published by business and trade organizations, and nonscientific publications (newspapers, encyclopedias, etc.) pertaining to asbestos and health.  Additional facts known to this expert were obtained through education, training, and experience as a medical doctor in the field of occupational medicine and epidemiology.

Dr. Cohen may also testify in rebuttal to Plaintiffs' witnesses.

6.  John E. Craighead, M.D., Box 4081, Burlington, VT 05406.

Dr. Craighead is a physician who is an expert in the field of pathology.  Furthermore, Dr. Craighead is an expert in the etiology and diagnosis of asbestos-related disease based upon review of tissue and tissue slides obtained as a result of biopsy or autopsy.

Dr. Craighead is expected to testify concerning general medical issues, including the methods and criteria for the diagnosis of asbestos-related diseases, and specifically regarding his opinions of causation of disease in humans.  Dr. Craighead is expected to testify generally about the human body's defense mechanisms, including the human respiratory system and related medical issues.

Dr. Craighead is expected to testify on matters pertaining to the diagnosis of the condition of plaintiffs in these cases specifically.  He is also expected to testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiffs, including but not limited to, tissue and/or slides that he will review.

7.     James D. Crapo, M.D., National Jewish Medical & Research Center, Department of Medicine, 1400 Jackson Street, Denver, CO 80206.

Dr. Crapo is Chairman of the Department of Medicine at the National Jewish Medical & Research Center.  Dr. Crapo is expected to testify concerning the effects of the inhalation of asbestos on animals and humans.  Further, he is expected to discuss the risk in humans from exposure to asbestos.

Dr. Crapo is expected to testify generally about the body's defense mechanisms and on general medical issues involving the human respiratory system.  Dr. Crapo is expected to testify about the effects upon the pleural cavity caused by the inhalation of asbestos.  Dr. Crapo is expected to testify that asbestosis is a restrictive disease requiring interstitial fibrosis in the parenchyma of the lung.  Dr. Crapo is further expected to testify that in order to associate asbestos exposure as a contributing factor to the development of lung cancer in a cigarette smoker, that person must have clinical evidence of asbestosis.

Dr. Crapo is further expected to testify concerning the diagnostic criteria and diagnostic tools used in diagnosing asbestos-related disease.  He is also expected to testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiffs, including, but not limited to, x-rays, CT scans, pulmonary function test results, and other materials that he will review.

8.     Melvin W. First, Sc.D., Harvard School of Public Health, 665 Huntington Avenue, Boston, MA 02115.

Dr. First is expected to testify on matters relating to industrial hygiene, including  the methodology of conducting industrial hygiene surveys and reporting and publishing results of industrial hygiene surveys.

Dr. First is qualified to testify as an expert on the basis of his education, training, and experience in the fields of industrial hygiene and engineering.  His academic qualifications include the degrees of Bachelor of Science in Biology and Public Health, Master of Science in Sanitary Engineering, and Doctor of Science in Industrial Hygiene Engineering.  Dr. First is a Certified Industrial Hygienist and a Registered Professional Engineer.  He is currently Professor Emeritus at the Harvard School of Public Health.

11

Dr. First is expected to testify about the standards, customs, and practices in the field of industrial hygiene concerning the manner and method of conducting hygiene surveys and reporting or publishing the results of those surveys during all time periods relevant to this litigation, including the periods during which Metropolitan Life conducted surveys relating to asbestos and reported or published the results of its surveys.  He is also expected to testify that the conduct of the various employees of Metropolitan Life in performing those surveys and in reporting and publishing their results conformed to the generally accepted standards, customs, and practices in the field of industrial hygiene. he may also testify in rebuttal to Plaintiffs' witnesses.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include those facts contained in documents pertaining to asbestos dust surveys conducted by Metropolitan Life, including reports, published articles, correspondence and memoranda, and facts obtained from a review of knowledge of government or industry standards relating to proper methodology for capturing and analyzing air samples, and facts obtained from textbooks and handbooks regarding industrial hygiene practice and similar material, and may include additional facts ultimately obtained from a review of the medical literature and a review of the testimony of fact and expert witnesses in this litigation. Additional facts known to this expert were obtained through professional education, training, and experience as an industrial hygienist.

9.    John Higginson, B.A., M.D., F.R.C.P. (by deposition)

Dr. Higginson is expected to testify regarding the protocol, methodology, and analysis of cancer experimentation; custom and practice regarding peer review and the editing of scientific work; and medical knowledge regarding asbestos.

Dr. Higginson is qualified to testify as an expert on the basis of his education, training, and experience in the fields of pathology, oncology, and cancer research.  He holds the following degrees: B.A., M.B., B.CH., B.A.O., F.R.C.P., and M.D.  His experience includes 15 years as director of the International Agency for Research on Cancer (I.A.R.C.).

Dr. Higginson is expected to testify about the accepted scientific standards and methods for conducting cancer research, including protocols and use of animals in cancer experimentation, and customs and practices regarding editing, peer review, and publication of scientific work and articles.  He is expected to testify that asbestos dust inhalation studies undertaken by Dr. Gardner at the Saranac Laboratory were not designed or conducted in a manner that would allow scientifically valid conclusions to be drawn from the incidence of mouse tumors about the carcinogenicity of asbestos.  He is expected to testify that the observation of tumors in mice resulting from these studies was incidental and scientifically inadequate for purposes of analyzing or assessing the carcinogenicity of asbestos; that its omission from the published study was justified on scientific grounds; and that its omission from the published study did not alter the development or progress of scientific inquiry regarding asbestos and cancer.  He is also expected to testify that an asbestos dust inhalation experiment sponsored by Quebec Asbestos Mining Association (QAMA) and undertaken by Saranac Laboratory did not support the proposition that asbestos caused cancer.  He is also expected to testify about medical knowledge regarding the health effects of asbestos.  He may also testify in rebuttal to plaintiffs' witnesses.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include those facts contained in documents relating to the inhalation dust studies performed at Saranac Laboratory, including correspondence, memoranda, transcripts, drafts and published reports and related material, as well as facts obtained about cancer research during the course of his education and professional activities, and facts contained in testimony of individuals once affiliated with Saranac Laboratory.  Such facts may also include additional facts ultimately obtained from a review of the medical literature and a review of testimony of fact and expert witnesses in this litigation.

10. Robert N. Jones, M.D., Tulane University School of Medicine, Department of Medicine, Section of Environmental Medicine SL 15, 1430 Tulane Avenue, New Orleans, LA 70112.

Dr. Robert N. Jones is a board-certified pulmonologist and Professor of Medicine at Tulane University School of Medicine.  Dr. Jones also is Senior Visiting Physician at Charity Hospital in New Orleans, an Attending Physician at Tulane Medical Center Hospital, a Consultant in Pulmonary Diseases to the Veterans Administration Medical Center in New Orleans, and a Medical Advisor to the Social Security Administration, Office of Hearings and Appeals, in Region VI.

Dr. Jones is expected to testify concerning the effects of the inhalation of asbestos on humans.  He also is expected to discuss the risks to humans of asbestos exposure, including asbestos-related disease processes, causation, progression, and impairment.  Dr. Jones is expected to testify generally about the human body's defense mechanisms, including the human respiratory system and related medical issues.

Dr. Jones is expected to testify about the diagnostic criteria and tools used in diagnosing asbestos-related disease.  He will testify about the effects upon the pleura and parenchyma caused by the inhalation of asbestos.  Dr. Jones also is expected to testify that asbestosis is a restrictive disease involving interstitial fibrosis in the parenchyma.

Dr. Jones is expected to testify that a smoker must have asbestosis, either clinically or histologically, in order to attribute lung cancer to asbestos exposure.  With respect to mesothelioma, Dr. Jones is expected to testify that there are other causes besides asbestos.

He is also expected to testify concerning the diagnosis or lack thereof of an asbestos related disease based upon the medical records of plaintiffs, including, but not limited to, x-rays, CT scans, pulmonary function test results, and other materials that he will review.

11. J. Steven Moore, M.D., M.P.H., C.I.H., 2426 Ecuadorian Way #14 Clearwater, Florida 33763.

Dr. Moore is expected to testify on matters relating to industrial hygiene and occupational medicine.

Dr. Moore is qualified to testify as an expert on the basis of his education, training, and experience in the fields of industrial hygiene and occupational medicine.  He holds the following degrees: Bachelor of Science in Physics, Master of Public Health in Occupational Medicine, and Medical Doctor.  He is a Certified Industrial Hygienist and certified in the field of occupational medicine by the American Board of Preventative Medicine.  Dr. Moore

previously held the positions of Executive Associate Dean and  Professor in the School of Rural Public Health in the Department of Environmental and Occupational Health at the Health Science Center at Texas A & M University.

Dr. Moore is expected to testify about the standards, customs, and practices in the field of industrial hygiene concerning the manner and method of conducting industrial hygiene surveys and reporting or publishing the results of those surveys during all time periods relevant to this litigation, including the periods during which Metropolitan Life conducted surveys relating to asbestos and reported or published the results of its surveys.  He is expected to testify that the conduct of the various employees of Metropolitan Life in performing those surveys and in reporting and publishing their results conformed to the generally accepted standards, customs, and practices in the field of industrial hygiene.  He is also expected to testify concerning certain clinical observations, physical examinations, and x-ray examinations made during the course of the surveys regarding asbestos dust performed by Metropolitan Life as well as those studies and/or surveys performed by others.

Dr. Moore is expected to testify that the conclusions and recommendations contained in the article by Lanza, McConnell and Fehnel entitled, "The Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers," United States Public Health Service Reports (Vol. 50, No. 1, January 4, 1935), were appropriate and supported by the data underlying the study.  He is also expected to testify that if the purported changes during the editorial process of the foregoing article that form, in part, the basis of plaintiffs' claims were made, they were appropriate, fully justified, and made in accordance with standards, customs and practices in effect then and now for the publication of work performed by outside consultants at the request of private enterprises.  Dr. Moore is also expected to relate and compare the 1935 article by Lanza, McConnell and Fehnel to the significant number of other articles during that time period also reporting that asbestos was dangerous.  Dr. Moore is also expected to testify regarding other publications by Lanza and Metropolitan Life, including but not limited to, Lanza, "Asbestosis," Journal of the American Medical Association 106:368-369 (1936) and Lanza, ed., Silicosis and Asbestosis, Oxford Univ. Press (1938), and their relationship to plaintiffs' claims concerning the 1935 article by Lanza and concerning the alleged concealment of information about asbestos hazards.

Dr. Moore is expected to testify about the physical examination survey performed by Johns-Manville at its Manville, New Jersey plant in 1932 and the assistance of others in connection with the survey, including the United States Government.  Dr. Moore is expected to testify that the report of the results of the survey did not contain materially new information about pneumoconiosis that was not published during the 1930's.

Dr. Moore is also expected to testify about the standards, customs and practices in the area of worker education and warnings during the relevant time frame.  If witnesses for the plaintiffs are permitted to testify on the subject of medical ethics, Dr. Moore can be expected to testify in rebuttal to such testimony.

Dr. Moore is also expected to testify that asbestos dust inhalation studies undertaken by Dr. Gardner at the Saranac Laboratory were not designed or conducted in a manner that would allow scientifically valid conclusions to be drawn from the incidence of mouse tumors about the carcinogenicity of asbestos.  He is also expected to testify that the observation of tumors in mice resulting from these studies was incidental and scientifically inadequate for purposes

14

of analyzing or assessing the carcinogenicity of asbestos; that its omission from the published study was justified on scientific grounds; and that its omission from the published study did not alter the development or progress of scientific inquiry regarding asbestos and cancer.

Dr. Moore is also expected to testify that an asbestos dust inhalation experiment sponsored by QAMA and undertaken by Saranac Laboratory did not support the proposition that asbestos caused cancer.  He is also expected to testify regarding the formation, purpose and composition of the Industrial Hygiene Foundation ("IHF") and certain studies concerning asbestos conducted by the IHF for other organizations.  Dr. Moore may also testify as to the development and maintenance of threshold limit values for asbestos exposure.  He may also testify in rebuttal to plaintiffs' witnesses.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include those facts contained in documents pertaining to asbestos dust surveys conducted by Metropolitan Life, including reports, published articles, correspondence and memoranda; those facts contained in the documents referred to in plaintiffs' complaints or relied upon by plaintiffs to base their claims in these cases; facts contained in the published literature regarding asbestos and health; facts obtained from a review or knowledge of government or industry standards relating to proper methodology for capturing and analyzing air samples; facts obtained from textbooks and handbooks regarding industrial hygiene practice and similar material; facts contained in documents relating to the inhalation dust studies performed at Saranac Laboratory, including correspondence, memoranda, transcripts, drafts and published reports and related material; facts obtained about cancer research during the course of his education and professional activities; and facts contained in testimony of individuals once affiliated with Saranac Laboratory.  Such facts may also include additional facts ultimately obtained from a review of the medical literature and a review of testimony of fact and expert witnesses in this litigation.  Additional facts known to this expert were obtained through education, training, and experience as a medical doctor in the field of occupational medicine and as a certified industrial hygienist.

Dr. Moore may also testify in rebuttal to Plaintiff's witnesses.


12.     David F. Musto, M.D.,  Deceased (by prior testimony)

Dr. Musto testified on matters relating to medicine and the history of medicine.

Dr. Musto was qualified to testify as an expert on the basis of his education, training, and experience as a medical doctor and a medical historian.  He held the following degrees: B.A. from the University of Washington, M.A. in History of Science and Medicine from Yale University, and M.D. from the University of Washington.  Dr. Musto was a member of the faculty of Yale University and has published widely in professional journals regarding a wide variety of topics relating to the history of medicine and science.  He was a Professor of Child Psychiatry and Professor of the History of Medicine at Yale University School of Medicine.

Dr. Musto testified about the historical standards, customs, and practices in the medical field.  He testified about the historical development of knowledge regarding asbestos and

health.  He also testified regarding the historical development of the practice of occupational medicine in the United States as related to asbestos, including the historical operations of the United States Public Health Service.  Dr. Musto testified regarding the historical and scientific significance of various studies relating to asbestos conducted by Metropolitan Life and other organizations.  Dr. Musto also testified about the historical context in which the alleged events giving rise to plaintiffs' claims occurred.

Dr. Musto testified about the standards, customs and practices in the field of medicine and scientific research concerning the manner and method of conducting surveys and reporting or publishing the results of those surveys during all time periods relevant to this litigation, including the periods during which Metropolitan Life conducted surveys relating to asbestos and reported or published the results of its surveys.  He also testified that the conduct of the various employees of Metropolitan Life in performing those surveys and in reporting and publishing their results conformed to the generally accepted medical standards, customs, and practices of the times.  He also testified about certain clinical observations, physical examinations, and x-ray examinations made during the course of those surveys regarding asbestos dust.

In this regard, Dr. Musto has testified, inter alia that the conclusions and recommendations contained in the article by Lanza, McConnell and Fehnel entitled, "The Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers," United States Public Health Service Reports (Vol. 50, No. 1, January 4, 1935), were appropriate and supported by the data underlying the study.  He also testified that if purported changes during the editorial process of the foregoing article that form, in part, the basis of plaintiffs' claims were made, they were appropriate, fully justified, and made in accordance with standards, customs, and practices in effect then and now for the publication of work performed by outside consultants at the request of private enterprises.  Dr. Musto has also  related and compared the 1935 article by Lanza, McConnell and Fehnel to the significant number of other articles during that time period also reporting that asbestos was dangerous.  Dr. Musto has testified regarding other publications by Lanza and Metropolitan Life, including but not limited to, Lanza, "Asbestosis," Journal of the American Medical Association 106:368-369 (1936) and Lanza, ed., Silicosis and Asbestosis, Oxford Univ. Press (1938), and their relationship to plaintiffs' claims concerning the 1935 article by Lanza and concerning the alleged concealment of information about asbestos hazards.

In addition, Dr. Musto testified that the conduct of various employees of Metropolitan Life in connection with the Pedley report, the Wheatley report, and statements concerning asbestos miners and millers in Canada were appropriate.

Dr. Musto has also testified about the standards, customs, and practices in the area of worker education and warnings during the relevant time frame.  If witnesses for the plaintiffs are permitted to testify on the subject of medical ethics, Dr. Musto can be expected to testify in rebuttal to such testimony.  He may also testify in rebuttal to plaintiffs' witnesses.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include those facts contained in documents pertaining to asbestos dust surveys conducted by Metropolitan Life, including reports, published articles, correspondence and memoranda; facts contained in the published literature regarding asbestos and health; and facts contained in documents referred to in Plaintiffs' complaint or relied upon by plaintiffs or their expert witnesses; and facts obtained from textbooks and handbooks regarding

16

medical practice and similar material.  Such facts may also include additional facts ultimately obtained from a review of the medical literature and a review of testimony of fact and expert witnesses in this litigation.  Additional facts known to this expert were obtained through education, training, and experience as a medical doctor and medical historian.

13.   Samuel Travis Pritchett, Ph.D., University of South Carolina, Columbia, SC 29208.

Dr. Pritchett is a Professor of Finance and Insurance at the College of Business Administration of the University of South Carolina.  He is a Chartered Life Underwriter, Chartered Property and Casualty Underwriter, and Chartered Financial Consultant.  He has received a Doctor of Business Administration degree, Master of Science degree and Bachelor of Science degree.

Dr. Pritchett is expected to testify, based on his training and experience, on how insurance companies in general and Metropolitan Life Insurance Company, in particular, do business, including, without limitation, the various forms of insurance and their purpose, the structure and operations of a life insurance company, and underwriting, financial, and other historical business activities, practices, and procedures.

14.   Emanuel Rubin, M.D., Jefferson Medical College, 1020 Locust Street, Suite 279, Philadelphia, PA 19107-6799.

Dr. Rubin is expected to testify regarding the protocol, methodology, and analysis of scientific and medical research and the protocol and practice regarding the process of editing and peer review of scientific research manuscripts.  Dr. Rubin is also expected to testify on matters relating to pneumoconiosis, lung cancer and mesothelioma, including histopathologic presentation and appropriate diagnostic criteria and methodology.

Dr. Rubin is qualified to testify as an expert on the basis of his education, training, and experience in the field of pathology.  He holds a Bachelor of Science degree from Villanova University and obtained a Medical Degree from Harvard Medical School.  Dr. Rubin is a Board-certified pathologist and is currently the Gonzalo E. Aponte Distinguished Professor of Pathology and Chairman Emeritus of the Department of Pathology, Anatomy and Cell Biology at the Jefferson Medical College in Philadelphia, PA.

Dr. Rubin is expected to testify about plaintiffs' pathology and histopathologic presentation, and diagnoses, assuming he is afforded the opportunity to examine their existing and available pathology, specifically including without limitation the slides and paraffin tissue blocks, and to perform appropriate diagnostic analyses.

Dr. Rubin is expected to testify about the accepted scientific standards and methods for conducting cancer research, including protocols and use of animals in cancer experimentation, and customs and practices regarding editing, peer review, and publication of manuscripts and scientific articles.  He is expected to testify that asbestos dust inhalation studies undertaken by Dr. Gardner at the Saranac Laboratory were not designed or conducted in a manner that would allow scientifically valid conclusions to be drawn from the incidence of mouse tumors about the carcinogenicity of asbestos.  He is expected to testify that the observation of tumors in mice resulting from these studies was inadequate and scientifically inconclusive for purposes of analyzing or assessing the carcinogenicity of asbestos; that its omission from the published study was justified on scientific grounds; and

that its omission from the published study did not alter the development or progress of scientific inquiry regarding asbestos and cancer. Dr. Rubin is also expected to testify regarding the scientific and medical literature regarding human asbestosis and lung cancer during the relevant period. He is also expected to testify that his conclusions reflected above are consistent with the conclusions expressed by Dr. Gardner himself in 1943 and the National Advisory Council of the National Cancer Institute in 1944.

Dr. Rubin is also expected to testify that an asbestos dust inhalation experiment sponsored by QAMA and undertaken by Saranac Laboratory did not support the proposition that asbestos caused cancer. He is also expected to testify about medical knowledge regarding the health effects of asbestos.

Dr. Rubin is also expected to testify about the standards, customs, and practices in the field of medical and scientific research concerning the manner and method of conducting surveys and/or studies and reporting or publishing the results of those surveys during all time periods relevant to this litigation, including the periods during which Metropolitan Life conducted surveys relating to asbestos and reported or published the results of its surveys. He is expected to testify that the conduct of the various employees of Metropolitan Life in performing those surveys and in reporting and publishing their results conformed to the generally accepted standards, customs, and practices in the field of medical and scientific research. He is also expected to testify concerning certain clinical observations, physical examinations, and x-ray examinations made during the course of the surveys regarding asbestos dust performed by Metropolitan Life as well as those studies and/or surveys performed by others.

Dr. Rubin is expected to testify that the conclusions and recommendations contained in the article by Lanza, McConnell and Fehnel entitled, "The Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers," United States Public Health Service Reports (Vol. 50, No. 1, January 4, 1935), were appropriate and supported by the data underlying the study. He is also expected to testify that if the purported changes during the editorial process of the foregoing article that form, in part, the basis of plaintiffs' claims were made, they were appropriate, fully justified, and made in accordance with standards, customs, and practices in effect then and now for the publication of work performed by outside consultants at the request of private enterprises. Dr. Rubin is also expected to relate and compare the 1935 article by Lanza, McConnell and Fehnel to the significant number of other articles during that time period also reporting that asbestos was dangerous. Dr. Rubin is also expected to testify regarding other publications by Lanza and Metropolitan Life, including but not limited to, Lanza, "Asbestosis," Journal of the American Medical Association 106:368-369 (1936) and Lanza, ed., Silicosis and Asbestosis, Oxford Univ. Press (1938), and their relationship to plaintiffs' claims concerning the 1935 article by Lanza and concerning the alleged concealment of information about asbestos hazards.

Dr. Rubin is expected to testify that the conduct of various employees of Metropolitan Life in connection with the Pedley report, the Wheatley report and statements concerning asbestos miners and millers in Canada were appropriate. If witnesses for the plaintiffs are permitted to testify on the subject of medical ethics, Dr. Rubin can be expected to testify in rebuttal to such testimony. He may also testify in rebuttal to plaintiffs' witnesses.

The facts known to this expert that relate to, or form the basis of, his opinions or mental impressions include those facts contained in documents relating to the inhalation dust

studies performed at Saranac Laboratory, including correspondence, memoranda, transcripts, drafts and published reports, and related material; facts obtained about cancer research during the course of his education and professional activities; facts contained in testimony of individuals once affiliated with Saranac Laboratory; facts contained in documents pertaining to asbestos dust surveys conducted by Metropolitan Life, including reports, published articles, correspondence and memoranda; facts contained in the published literature regarding pneumoconiosis and health; and facts contained in documents referred to in Plaintiffs' complaints or relied upon by plaintiffs or their expert witnesses. Such facts may also include additional facts ultimately obtained from a review of the medical literature and a review of testimony of fact and expert witnesses in this litigation.

Dr. Rubin may also testify in rebuttal to Plaintiff's witnesses.

15.  Harold D. Skipper, Jr., Ph.D., 3611 Tanglewood Drive, Atlanta, Georgia 30339.

Dr. Skipper is a retired Professor of Risk Management and Insurance in the Department of Risk Management and Insurance, Georgia State University, where he holds the C.V. Starr Chair of International Insurance. Dr. Skipper also is a Chartered Life Underwriter. He has received the following degrees: Bachelor of Business Administration, Master of Arts in Economics, and Doctor of Philosophy in Business and Applied Economics.

Dr. Skipper is expected to testify, based on his training and experience, on how insurance companies in general and Metropolitan Life Insurance Company, in particular, do business, including, without limitation, the various forms of insurance and their purposes, the structure and operations of a life insurance company, and other historical business activities, practices, and procedures.

16.  David J. Weiner, MBA, Vavoulis & Weiner, LLC, 445 South Figueroa Street, Suite 3700, Los Angeles, California 90071-1641.

Mr. Weiner is an Economist. Mr. Weiner is qualified to testify as an expert on the basis of his education, training and experience as an economist. Mr. Weiner is an economist and principal of Vavoulis & Weiner, LLC. He has received the following degrees: M.B.A. in Marketing and Entrepreneurial Management from the Wharton School, University of Pennsylvania; and, B.S. with Honors, in Business Administration from the University of California Berkeley.

Mr. Weiner is expected to testify about the nature and extent of Plaintiffs' economic losses, if any. Mr. Weiner may also offer opinion testimony critiquing the methodology employed by, and opinions offered by, Plaintiffs' experts. Mr. Weiner may supplement this report upon review of Plaintiffs' economic damages report.

Mr. Weiner may also testify in rebuttal to Plaintiffs' witnesses.

17.  Elizabeth Weisburger, Ph.D., (by deposition)

Dr. Weisburger is expected to testify regarding the protocol, methodology, and analysis of cancer research and the protocol and practice regarding the process of editing and peer review of scientific research manuscripts.

Dr. Weisburger is qualified to testify as an expert on the basis of her education, training, and experience in the field of cancer research. She holds Bachelor of Science and Ph.D. degrees in Organic Chemistry. Her experience includes more than 30 years as a Research Scientist and Assistant Director at the National Cancer Institute.

Dr. Weisburger is expected to testify about the accepted scientific standards and methods for conducting cancer research, including protocols and use of animals in cancer experimentation, and customs and practices regarding editing, peer review, and publication of manuscripts and scientific articles. She is expected to testify about information contained in documents upon which plaintiffs base their claims in these actions regarding a certain purported asbestos dust inhalation study undertaken by Dr. Leroy Gardner of the Saranac Laboratory and as reflected in a 15-page document entitled Annotated Outline of Proposed Monograph on Asbestosis. Dr. Weisburger is expected to testify that such study was not designed or conducted in a manner that would allow conclusions to be drawn from the incidence of tumors. She is also expected to testify that the observation of tumors in mice resulting from this study was accidental, unintentional, incidental, improperly designed, and scientifically inadequate for purposes of analyzing or assessing the carcinogenicity of asbestos; that the number of animals were too few, there were no unexposed controls, the age and strain of the mice were unknown, and the experiment was scientifically meaningless; and that its omission from the article by Vorwald, Durkan and Pratt entitled, "Experimental Asbestosis," 3 Arch. Ind. Hyg. 1-43 (1951), did not alter the development or progress of scientific inquiry regarding asbestos and lung cancer and was proper and scientifically justified; and that the experiment, if reported to a scientific journal, should not have passed peer review. She is also expected to testify that her conclusions reflected above are consistent with the conclusions expressed by Dr. Gardner himself in 1943 and the National Advisory Council of the National Cancer Institute in 1944.

She is also expected to testify that an asbestos dust inhalation experiment sponsored by QAMA and undertaken by Saranac Laboratory did not support the proposition that asbestos caused cancer.

The facts known to this expert that relate to, or form the basis of, her opinions or mental impressions include those facts contained in documents relating to the inhalation dust studies performed at Saranac Laboratory, including correspondence, memoranda, transcripts, drafts and published reports, and related material, as well as facts obtained about cancer research during the course of her education and professional activities, and facts contained in testimony of individuals once affiliated with Saranac Laboratory, i.e., Dr. Philip Pratt. In particular, Dr. Weisburger will rely in part upon the above-referenced outline and a number of documents plaintiffs rely upon to support their claims in these cases as well as other documents, including but not limited to, a letter from Gardner to Brown dated February 24, 1943, a March 15, 1943 letter from Gardner to Hektoen, a March 20, 1943 letter from Hektoen to Gardner, a June 3, 1943 Application for Grant-in Aid made by the Director of the Saranac Laboratory to the National Advisory Cancer Council, National Cancer Institute, the Proceedings of the Twenty-Fourth Meeting of the National Advisory Council, National Cancer Institute (January 8, 1944), 13 pages of Dr. Gardner's handwritten notes, and Lynch et al., "Pulmonary Tumors in Mice Exposed to Asbestos Dust," A.M.A. Archives of Industrial Health 15:207-214 (March 1957). Dr. Weisburger is also expected to rely upon other published articles pertaining to asbestos and cancer prior to, contemporaneous with, and subsequent to the 1951 article by Vorwald, Durkan, and Pratt.

Additional facts known to this expert were obtained through education, training and experience as an expert in the field of experimental cancer research.

Metropolitan Life does not, by listing any person as a potential witness, vouch for that person's competence as a witness.  Metropolitan Life reserves the right to challenge the expertise and competence of any witness called to testify live or by deposition, including those listed above.

Counsel for Metropolitan Life reserves the right to designate other witnesses identified during the continuing discovery in this matter, including any records custodians necessary to authenticate documents or exhibits, and any witnesses for rebuttal.

In addition, Metropolitan Life reserves the right to amend or supplement its list of designated witnesses in accordance with the Federal Rules of Civil Procedure and all applicable local rules.  Additional witnesses may be added both subsequent to Metropolitan Life's receipt of plaintiffs' responses to discovery an as required to rebut allegations that plaintiffs may make in other discovery or in testimony that may be given by plaintiffs' experts.

Each witness listed is hereby tendered for deposition.  Please contact the undersigned to schedule.

von BRIESEN & ROPER, S.C.

DATED: September 26, 2017.                    By:      s/ Smitha Chintamaneni
                                                       Smitha Chintamaneni
                                                       WI Bar No. 1047047
                                                       Attorney for Defendant,
                                                       Metropolitan Life Insurance Company

**P. O. ADDRESS**:
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
PH:     (414) 287-1515
Fax:    (414) 276-6281
Email:  schintam@vonbriesen.com

29346365_1.DOCX