IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PAMELA KILTY, individually and as
Special Administrator of the Estate of
Elvira Kilty, PAUL J. KILTY, DAVID
L. KILTY, WILLIAM J. KILTY and
JAMES S. KILTY,

                 Plaintiffs,               OPINION AND ORDER

   v.

                                                            16-cv-515-wmc

WEYERHAEUSER COMPANY, 3M COMPANY,
and METROPOLITAN LIFE INSURANCE
COMPANY,

                 Defendants.

---

SCOTT SPATZ, individually and as
Special Administrator of the Estate of
Herbert Spatz,

                 Plaintiff,

   v.

                                                           16-cv-726-wmc

WEYERHAEUSER COMPANY, 3M COMPANY,
and METROPOLITAN LIFE INSURANCE
COMPANY,

                 Defendants.

---

Plaintiffs assert negligence and strict liability claims against 3M for manufacturing and selling respirators, which original plaintiffs Elvira Kilty and Herbert Spatz used while working in a factory that manufactured fireproof doors with asbestos cores. Both Kilty and Spatz eventually developed and died from mesothelioma as a result of asbestos

exposure.[1] Before the court are motions for summary judgment by defendant 3M Company. ('515 dkt. #122; '726 dkt. #106.) For the reasons that follow, the court will deny those motions, finding that plaintiffs have raised a genuine issue of material fact as to whether the respirators were defective under both strict liability and negligence law.

OVERVIEW OF UNDISPUTED FACTS[2]

**A. Claims and Parties**

Plaintiffs assert claims for negligence and strict liability against defendant 3M arising out of their contracting mesothelioma as a result of exposure to asbestos while working at Weyerhaeuser Company door manufacturing plant located in Marshfield, Wisconsin. Plaintiffs' claims do not concern direct exposure to asbestos from a 3M product; rather, plaintiffs allege that its branded "8710" respirators were defective and unreasonably dangerous because their design did not adequately protect against or prevent exposure to asbestos fibers.[3]

---

[1] For ease of reference in this opinion, the court will use "plaintiffs" to refer to these original plaintiffs alleging direct injury from use of 3M's respirators, rather than the special administrators representing their estates or other family members now pursuing claims.

[2] For purposes of deciding the present summary judgment motions, unless otherwise noted, the court finds the facts set forth in this overview and elsewhere in the opinion to be undisputed.

[3] In their complaints, plaintiffs also assert failure to warn claims, but in their respective oppositions to 3M's motions, plaintiffs clarify that their failure to warn claims are really just an extension of their product defect claims. (*See, e.g.,* Pl.'s Opp'n ('515 dkt. #205) 7 ("Plaintiffs do not claim 3M should have warned Elvira Kilty, herself, about asbestos. That is a gross mischaracterization of Plaintiffs' position. The only failure to instruct or warn claim here could be: (1) a failure to warn that the 8710 was completely useless to protect anyone, not specifically Elvira Kilty, against asbestos, even if used exactly as instructed; and (2) to warn that the 8710 did not meet NIOSH certification standards. . . . But this really means that the 8710 should not have been sold to protect against asbestos, a result that eventually happened in the late 1980s.").) In other words, any failure to warn claim is necessarily predicated on a finding of a product defect. As such, the court has not

Plaintiff Elvira Kilty was employed at Weyerhaeuser between 1955 and 1994. Until 1967, Kilty was an asbestos-core door patcher, splicer and inspector in the finishing department; from 1967 to 1987, she was a core gluer, molder feeder and core patcher in the asbestos core mill. Kilty was diagnosed with mesothelioma on October 2, 2015.

Plaintiff Herbert Spatz was employed at Weyerhaeuser from 1962 to 2001. Spatz was a packer in the craftwall section in 1962. From 1962 to 1968, Spatz worked in the asbestos core mill, again as a craftwall packer helper, and also as a filler sprayer and panel coder. On July 22, 1968, until Weyerhaeuser discontinued its use of asbestos, Spatz worked as a pan filler in the mineral core department, where asbestos mineral cores were produced. He was diagnosed with mesothelioma on October 21, 2015.

On July 18, 1972, Wes Sydow issued a Weyerhaeuser interoffice communication stating that it was necessary to wear face masks whenever mineral core is being machined or sanded. On December 1, 1972, a Weyerhaeuser interoffice communication was issued by Jim Gallatin to all mineral core department employees, titled "Personal Protective Clothing & Equipment Policy," mandating the use of masks for all mineral core department employees. Two employees who worked in the mineral core department around that time also observed employees wearing masks, one of whom, Mary Crist, identified the box containing the masks as labeled with "3M." Moreover, Crist recalled Kilty wearing the mask, at least at times, while working in the mineral core department.

---

set forth certain proposed findings only relevant to a failure to warn claim, and specifically, those facts relevant to plaintiffs' employer as sophisticated user defense; nor will the court take up this argument in the opinion below.

**B. Certification of the 3M 8710 Respirator**

In 1972, the National Institute of Occupational Safety and Health ("NIOSH") and the U.S. Bureau of Mines ("USBM") jointly enacted respirator regulations to oversee the performance and quality of respiratory equipment. *See* 30 C.F.R. § 11. (*See* Finch Aff., Ex. 1 (dkt. #202-1).)[4] The regulations provided that respirators shall be considered approved for use "only where such respirators . . . are . . . [t]he same in all respects as those respirators which have been approved after meeting the minimum requirements for performance and respiratory protection prescribed in this Part 11." 30 C.F.R. § 11.2. (*See* Finch Aff., Ex. 1 (dkt. #202-1) p.4.) The regulations also required manufacturers "to maintain . . . the approved quality control sampling schedule and the acceptable quality level for each characteristic tested, and to insure that it is manufactured according to the drawings and specifications upon which the certificate of approval is based." 30 C.F.R. § 11.33(f). (*See* Finch Aff., Ex. 1 (dkt. #202-1) p.7.)

The 3M 8710 Respirator was designed to protect a user from inhaling asbestos above the permissible exposure level ("PEL"). On May 24, 1972, 3M received the certificate of approval from the NIOSH and the USBM for the 8710 Respirator. The 8710 Respirator was certified for protection from asbestos at levels of up to 10 times the PEL. The 8710 Respirator maintained uninterrupted NIOSH certification as a single-use respiratory from 1972 until 1998 when 3M voluntarily withdrew it from sale in the United States.

---

[4] Unless otherwise noted, the docket entries refer to Case No. 16-cv-515.

As part of an application for approval or a modification of approval under the regulations, applicants were required to submit a quality control plan, setting forth various provisions for the management of quality. 30 C.F.R. § 11.40. (*See* Finch Aff., Ex. 1 (dkt. #202-1) p.8.) The approved quality control plans are "incorporated into a certificate of approval." 30 C.F.R. § 11.42(c). (*See id.* at p.8.) As discussed in more detail below, NIOSH approved 3M's quality control plan. The regulations further provided that the NIOSH and the USBM reserved the right to "revoke, for cause, any certificate of approval issues pursuant to the provisions." 30 C.F.R. § 11.34. (*See* Finch Aff., Ex. 1 (dkt. #202-1) p.7.) The regulations also set forth the process for seeking approval of modifications to approved requirements. 30 C.F.R. § 11.35. (*See* Finch Aff., Ex. 1 (dkt. #202-1) p.7.)

The bulk of the parties' proposed findings of facts concern whether 3M's 8710 mask performed as certified. The court addresses these proposed facts and the parties' disputes below in the opinion.

## OPINION

To prove a claim of strict liability under Wisconsin law, plaintiff must demonstrate:

> (a) That the product is defective because it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings.
>
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
>
> (c) That the defective condition existed at the time the product left the control of the manufacturer.
>
> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.

> (e) That the defective condition was a cause of the claimant's damages.

Wis. Stat. § 895.047(1).[5] A product contains a design defect if "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a).

Material to defendant's motion for summary judgment, subsection (b) provides certain defenses, including:

> Evidence that the product, at the time of sale, complied in material respects with relevant standards, conditions, or specifications adopted or approved by a federal or state law or agency shall create a rebuttable presumption that the product is not defective.

Wis. Stat. § 895.047(3)(b).[6] Despite NIOSH/ USBM certification of the 3M Respirator, plaintiffs contend as an initial matter that the presumption does not apply here because the plain language of the statute requires "compli[ance] in <u>material respects</u> with relevant standards and specifications," and plaintiffs contend that 3M did not comply with NIOSH and USBM regulations. (Pls.' Opp'n (dkt. #205) 13.) This argument has no traction. Indeed, adopting plaintiffs' interpretation would essentially gut the presumption's application by requiring a defendant to prove compliance with all relevant standards and specifications. Instead, as is the case here, where a governmental agency issues certain

---

[5] Wisconsin Statute § 895.047 governs plaintiffs' strict liability claims because their actions were commenced on or after February 1, 2011. 2011 Wis. Act 2, § 45(5).

[6] This rebuttable presumption does not apply to plaintiffs' negligence claims. *See* Wis. Stat. § 895.047(6).

regulations, requires compliance with those regulations, and then issues and reissues a certification based on a demonstration that those requirements are met, the presumption applies. Still, the presumption is rebuttable, and, for the reasons explained below, plaintiffs have put forth sufficient evidence from which a reasonable jury could find the 8710 Respirator was defective.

In addition to a strict liability claim, plaintiffs also assert a negligence claim under Wisconsin common law. As the Seventh Circuit has recognized, there is significant overlap between these two claims. *See Krien v. Harsco Corp.*, 745 F.3d 313, 317 (7th Cir. 2014) ("[A] claim of strict products liability is much like a negligence claim because it requires proof either that the product was unreasonably dangerous or, what amounts to the same thing, that it was defective.") (discussing Wisconsin law). To succeed on this claim, plaintiffs must prove:

> (1) the existence of a duty of care on the part of the defendant,
>
> (2) a breach of that duty of care,
>
> (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and
>
> (4) actual loss or damage resulting from the [breach].

*Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 717 N.W.2d 17 (quoting *Gritzner v. Michael R.*, 2000 WI 68, ¶ 19, 235 Wis. 2d 781, 611 N.W.2d 906). Because the same evidence advanced by plaintiff to rebut the presumption that the product was not defective is sufficient to permit a reasonable jury to find the elements of negligence, this claim must also proceed to trial.

7

Since both of plaintiffs' claims rest on a defective design theory, the court is mindful that the respirators were not designed to prevent *all* asbestos exposure, but rather were approved for use as protection from asbestos at levels up to 10 times the PEL. Whether to rebut the presumption under Wis. Stat. § 895.047(3)(b) or to demonstrate a breach of the duty of care owed under Wisconsin law, plaintiffs posit three core, overlapping theories, which the court addresses in turn below.

## I. Pressure Drop as Quality Metric

Plaintiffs principally argue that the 8710 Respirator was defective because it failed to meet the required inhalation and exhalation pressure drop values. Pressure drop values concern breathing resistance. In its opening submission, 3M argued that pressure drop is solely a comfort issue, not relevant to a respirator's ability to reduce exposure to fibrosis producing dusts. (Def.'s PFOFs (#126) ¶ 88 (citing Eitzman Aff. (dkt. #146) ¶ 11).) As such, any defect of the mask with respect to pressure drop would not implicate its ability to protect plaintiffs from asbestos exposure.

In response, plaintiffs direct the court to an article authored by a 3M occupational health and environmental safety employee that discusses the effect of pressure drop on respiratory leakage for particulate filter respirators such as the 8710, concluding that "increasing breathing resistance increases the faceseal leak rate." (Pls.' Add'l PFOFs (dkt. #204) ¶ 23 (quoting Finch Aff., Ex. 2 (dkt. #202-2)).) In particular, the "increase in faceseal leak rate from 5.6 mm to 19.6 mm breathing resistance was as high as a factor of 4." (*Id.*) Plaintiffs also point out that prior to the enactment of 30 C.F.R. § 11, 3M petitioned the USBM and NIOSH to raise the pressure drop value from 15 mm to 20 mm.

USBM and NIOSH denied that request, which plaintiffs contend constitutes evidence that the 15 mm pressure drop value was a "critical part" of a respirator's certification for asbestos use. Furthermore, plaintiffs point out that 3M's quality control plan identified inhalation and exhalation test results as a "Major A" defect,[7] and therefore 3M was aware that they had to bring the Acceptable Quality Limit (AQL) down to 1% in order to "be in compliance with the regulations and maintain . . . certification." (Pls.' PFOFs (dkt. #204) ¶ 25 (quoting Finch Aff., Ex. 39 (dkt. #202-39)).)

While 3M attempts to rebut this evidence by either arguing that it does not provide the support plaintiffs claim or is otherwise suspect (*see* Def.'s Reply (dkt. #235) 11-13), this exchange simply demonstrates that plaintiffs have raised a genuine issue of material fact as to whether pressure drop is more than just a comfort issue and concerns quality, and, in turn, protection from asbestos exposure.[8] All of this is for a jury to sort out.

---

[7] The regulations classified product defects into four classes, according to the potential effect of such a defect. A "Major A" defect is defined as "[a] defect, other than critical, that is likely to result in failure to the degree that the respirator does not provide any respiratory protection or a defect that reduces protection, and is detectable by the user." 30 C.F.R. § 11.42(d)(2).

[8] In reply to its motion, 3M relies on a 2005 article on faceseal leakage and a 1980 audit document, which, notably, post-dates the relevant period for plaintiffs' claims, to support its argument that any issue in pressure drop values did not concern quality. Even in the audit document, a government supervisory chemist acknowledges that the 8710 "failed final exhalation resistance," while concluding that this was not "a critical problem since this slightly higher resistance should not threaten the life or health of the user." (Eitzman Aff., Ex. 2 (dkt. #241-2).) In the 2005 article, the authors criticized prior studies finding a correlation between pressure drop values and faceseal leakage. (*Id.*, Ex. 1 (dkt. #241-1).) While this evidence may be persuasive, it does not foreclose a jury finding that pressure drop impacts a mask's effectiveness at preventing asbestos exposure and, therefore, any defect with respect to pressure drop may be material in determining plaintiffs' negligence and strict liability claims.

## II. Compliance with Silica Testing

As part of the certification application for NIOSH and USBM approval, applicants were required to perform a silica dust test, the requirements of which were set out in the regulations. 30 C.F.R. §§ 11.140-4, 11.140-5. (Finch Aff., Ex. 1 (dkt. #202-1) p.24.) The silica dust test measured penetration, as well as pressure drop. The regulations set forth certain environmental conditions for the testing, including humidity and room temperature.

While there is no dispute that 3M performed the required silica dust test as defined under 30 C.F.R. § 11.140 in its original submission for approval of the 3M 8710 respirator and all subsequent submissions for extension of approval, plaintiffs contend that 3M was required as part of its own quality control manual, submitted with its application for certification, to regularly test the 8710 using the silica dust test, as described in the regulations. 3M adamantly disputes that it was required to perform the same silica dust test as part of its quality manual plan. Instead, 3M asserts that a regularly conducted "DOP test" correlated to the silica dust test, and that NIOSH approved 3M's use of that test as part of 3M's quality control plan.

Plaintiffs do not dispute that NIOSH and USBM approved this alternative test, but contend that "3M did not notify Bureau of Mines or NIOSH that the correlation between the silica dust test and the DOP test that was approved as a substitute for silica dust testing was no longer valid." (Pls.' Add'l PFOFs (dkt. #204) ¶ 50.) Even if true, however, plaintiffs' claim that the DOP testing was somehow inadequate would only be tangentially material if the manufactured masks fail the pressure drop requirement. Indeed, viewed in

isolation, whether the DOP test was an adequate alternative to the silica dust test -- especially in the face of NIOSH and USBM approval of this alternative test -- appears to be largely a red herring, at least absent proof not only that the mask would have failed the silica dust test *and* that failure constituted a material defect in the product.

### III. Evidence of Performance Issues

Much more persuasive is plaintiffs' evidence that 3M's internal testing revealed that the 8710 respirators did not meet the requirements for final pressure drop and that 3M failed to disclose this testing to NIOSH and USBM. This internal testing data appears to span from 1972 through 1978, when Weyerhaeuser discontinued its use of asbestos in the production of fireproof doors.

In an internal 3M memorandum, dated June 1972,[9] 3M employees describe "test results from several different #8710 Respirator constructions," which "showed a number of interesting conclusions," including that "[t]he final pressure drop readings on the Bureau equipment was generally higher than those obtained in St. Paul." (Finch Aff., Ex. 8 (dkt. #202-8) 1.) Later, 3M appears to have addressed, or at least attempted to address this issue, by adjusting certain standards for the inner shells of the mask. (*Id.*, Ex. 9 (dkt. #202-9).)

In 1973, however, the pressure drop problems appear to continue. In September 1973, an internal 3M memo states that "[t]he factory has been unable to make slit web

---

[9] Although it appears the correct date is 1972, the memo is dated June 1971. (*See* Finch Aff., Ex. 9 (dkt. #202-9) 1 (9/15/72 memo referencing Jim Dryad's research "earlier this summer").)

with an acceptable pressure drop from individual webs made using current single web specifications." (*Id.*, Ex. 14 (dkt. #202-14).) In October 1973, another memo describes the production process as "out of control." (*Id.*, Ex. 15 (dkt. #202-15).) "Recent samples drawn from production are now unacceptably high in final pressure drop." (*Id.*) Still, the memo writer advised that "[p]roduct may be released but every effort should be made to get back into certification specifications." (*Id.*) In March 1974, an internal 3M memo describes continuing "problems" with pressure drop, even indicating that 3M "run[s] the risk of being challenge by NIOSH on our present 8710 certification." (*Id.*, Ex. 16 (dkt. #202-16).) Similarly, a memo from later that same month states that the "final pressure drop on masks being produced was <u>outside</u> the specifications <u>NIOSH approved</u>." (*Id.*, Ex. 16 (dkt. #202-17) (emphasis in original).) The memo also describes a graph plotting test results and states, "[a]s you can see we have been skirting this problem since September and really never been very safe in regard to" pressure drop. (*Id.*)

In July 1974, 3M submitted the 8710 respirator for an extension of approval based on the DOP testing results, apparently without informing NIOSH of the earlier silica dust testing results. (*Id.*, Ex. 19 (dkt. #202-19).) NIOSH approved the DOP test as a substitute "for production information only," but reiterated that "[i]t will still be the requirement of NIOSH to use silica dust as described in 30 CFR 11." (*Id.*, Ex. 20 (dkt. #202-20).)

Yet the problems continued into 1975. While 3M attempts to deflect this additional evidence by stating that it reflects "candid discussions" (*see, e.g.*, Def.'s Resp. to Pls.' Add'l PFOFs (dkt. #236) ¶ 16), those documents nonetheless would appear to support a finding that the manufactured masks were not meeting the pressure drop requirements.

12

For example, in a January 16, 1975, memo, the author describes "[s]everal disturbing production practices," including that "[t]he silica dust audit of the 8710 indicates we are producing masks with an unacceptably high pressure drop." (*Id.*, Ex. 21 (dkt. #202-21).) While a response memo, dated January 27, 1975, refers to DOP testing showing that the finished respirators with unacceptable pressure drop values have been decreasing, causing the author to conclude that "there is no correlation between the DOP machine and the silica dust test regarding" pressure drop, this is hardly definite proof that no defect existed. (*Id.*, Ex. 22 ('dkt. #202-22); *see also id.*, Ex. 24 (dkt. #202-24) ("The silica dust test is the ultimate determination of acceptability. This test measures some things that the DOP machine does not."); *id.*, Ex. 36 (dkt. #202-36) 2 ("Results to date show a poor correlation between DOP AP and Silica Initial AP").)

Regardless, consistent with these internal memos, NIOSH conducted an audit of 3M's 8710 mask in the spring of 1975 and also found that the respirators were not meeting the final inhalation resistance requirements. (*Id.*, Ex. 23 (dkt. #202-23).) Accordingly, NIOSH advised 3M that it "should correct this immediately by tightening the quality control of this characteristic." (*Id.*) Despite this admonishment, a June 1975 internal memo states, "[t]est results show that efforts to date to lower the final pressure drop using the new test method have not been successful." (*Id.*, Ex. 27 ('dkt. #202-27) 1.)

According to other internal memos, 3M eventually convened a multi-day meeting in June 1976 to "determine an initial course of action for eliminating the pressure drop problem with the #8710." (*Id.*, Ex. 29 (dkt. #202-27) 1.) Similarly, a September 1976 memo reflects continued issues with both silica dust testing and DOP testing of the 8710

mask.  (*Id.*, Ex. 30 (dkt. #328-30).)  An October 1976 memo reflects continued efforts to "develop an acceptable replacement for the 8710 which is capable of satisfying the requirements set forth in the government silica dust test." (*Id.*, Ex. 31 (dkt. #202-31).) Finally, in 1977, internal silica dust test results still show continued problems with pressure drop.  (*Id.*, Exs. 34, 35, 36, 37 (dkt. ##202-34, 202-35, 202-36, 202-37).)

While 3M raises issues with respect to individual exhibits, the impact of the government's changes on testing protocol had on 3M's internal testing results, questions as to 3M's obligation to inform NIOSH of its internal testing results, and the results themselves, and the arguable significance of this evidence of continuous production deficiencies as a whole raise factual issues that cannot be resolved at summary judgment.

From all of this, the court is satisfied that a reasonable jury could find that:  (1) pressure drop relates to more than just comfort, but also impacts faceseal and, in turn, the ability of the mask to prevent asbestos exposure; and (2) 3M manufactured and sold masks that did not meet the certification requirement values for pressure drop.  This is not to say that plaintiffs' task to establish liability at trial will be easy.  Far from it, even if plaintiffs succeed in demonstrating these two arguable deficiencies constituted defects, each plaintiff will still need to prove that:  he or she used the masks, and used them as instructed; the defect with respect to pressure drop caused materially different exposure to asbestos; and the exposure to asbestos caused by 3M's defective respirators was a substantial contributing factor to their mesothelioma diagnoses.    *See* Wis. Stat. § 895.047(1)(e) (setting forth causation standard for strict liability claim); *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 717 N.W.2d 17 (describing causation requirement under

Wisconsin law for negligence claim); *Boyer v. Weyerhaeuser Co.*, No. 12-CV-899-WMC, 2016 WL 705233, at *18 (W.D. Wis. Feb. 19, 2016), *aff'd sub nom. Pecher v. Owens-Illinois, Inc.*, 859 F.3d 396 (7th Cir. 2017) (requiring that asbestos exposure be a "substantial contributing factor" to mesothelioma diagnosis). However, none of those issues were raised on summary judgment, and therefore will have to await trial.[10]

ORDER

IT IS ORDERED that defendant 3M Company's motions for summary judgment ('515 dkt. #122; '726 dkt. #106) are DENIED.

Entered this 1st day of June, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[10] The court finds 3M's internal memos sufficiently powerful to make a determination as to the viability of plaintiffs' punitive damages claim premature as well, although defendant is free to seek a directed verdict on this claim while the jury deliberates on liability and after plaintiffs have made any further proffer of evidence material to that claim.